# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16-cr-00086-TLS-SLC |
| | ) | |
| SHON L. GIBSON | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to dismiss the indictment, or in the alternative, to suppress all evidence (DE 20) filed by Defendant Shon L. Gibson. Gibson seeks to suppress evidence discovered by police officers in their search of Gibson's home on December 13, 2016, as well as any subsequent custodial interrogation. Gibson argues that the indictment should be dismissed and/or the evidence should be suppressed in this case because all of the evidence was obtained as a result of violations of his Fourth Amendment rights. After considering the evidence and arguments submitted by the parties in this matter, I RECOMMEND that Gibson's motion to dismiss the indictment or, alternatively, to suppress all evidence be DENIED.

## I.  BACKGROUND

On December 20, 2016, Gibson was indicted on a two-count Indictment for: in Count 1, possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); and in Count 2, being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (DE 13). On December 20, 2016, Gibson pleaded not guilty. (DE 17). On January 17, 2017, Gibson filed the instant motion. (DE 20). This matter was referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). (DE 23). An evidentiary hearing on this matter was held on February 28, 2017. (DE 25; DE 30). On April 17, 2017, Gibson filed a post-hearing brief in support of his motion to suppress. (DE 28).

The Government filed its response on June 14, 2017.  (DE 35).  Gibson filed his reply brief on June 28, 2017.  (DE 36).

At the Government's request, the Court held a supplemental evidentiary hearing on September 14, 2017.  (DE 40; DE 43).  Gibson filed his brief relating to that hearing on November 20, 2017.  (DE 42).  The Government filed its supplemental response brief on December 22, 2017 (DE 46), and Gibson filed his supplemental reply brief on December 28, 2017 (DE 47).

## II.  FINDINGS OF FACT

### A.  February 29, 2017, Hearing

At the initial evidentiary hearing, the Government offered the testimony of Officer Brandon Garrison ("Officer Garrison") of the Wolcottville Police Department and Deputy Kyle Hartman ("Deputy Hartman") of the Noble County Sheriff's Department.  Gibson did not testify or call any witnesses to testify.  The Government and Gibson agreed that the application and the warrant would be submitted as exhibits to the post-hearing briefing.  (DE 32, Transcript of Motion to Suppress Hearing ("Tr.") 111).  The testimony of the officers was not contested in any meaningful way at the hearing, and I FIND their testimony to be credible.

### 1.  Officer Garrison's Testimony

Officer Garrison testified as follows:

On the evening of December 13, 2016, Officer Garrison was on patrol in Wolcottville, Indiana, while wearing a police uniform and driving his marked police car.  (Tr. 13).  Officer Garrison was patrolling a residential neighborhood around Park Street, which is made up of houses as well as two trailer parks.  (Tr. 16).  The neighborhood that Officer Garrison was

2

patrolling was on the Noble County side of Wolcottville, as the town of Wolcottville is located half in LaGrange County and half in Noble County. (Tr. 11, 16). The town of Wolcottville had been experiencing "a rash of burglaries and thefts in the Noble County area," as well as a big problem with methamphetamine use. (Tr. 11). The burglaries had taken place in the specific neighborhood that Officer Garrison was patrolling and included multiple thefts of four-wheelers. (Tr. 17). The Wolcottville Police Department began doing special patrols in the area of the trailer park to try to prevent more burglaries from occurring, and the Noble County Sheriff's Department had also put out extra patrols in the area. (Tr. 17).

While on patrol, at about 10:09 p.m., Officer Garrison saw two men walking on Park Street near where it intersected with Lovette. (Tr. 13-15). Officer Garrison's attention was drawn to the men because it was "brutally cold that night," and it was unusual for anyone to be walking at that time of night in Wolcottville. (Tr. 15-17). Officer Garrison was suspicious of the men because a four-wheeler and a trailer had been stolen just one street over about a week before, and he did not believe either Gibson or his companion lived in Wolcottville, as he has lived there his entire life. (Tr. 13, 15, 20). Also, although Gibson was wearing a thick Carhartt jacket and jeans, his companion was wearing pajama pants and a sweatshirt, with no hat or gloves, which was not appropriate for the very cold weather. (Tr. 20, 22).

Additionally, Officer Garrison recognized Gibson based on numerous tips he had received from multiple individuals since January 2016, along with information provided by other officers, that Gibson was involved in a motorcycle gang and was distributing large quantities of methamphetamine. (Tr. 18-19, 21). Officer Garrison's experience and training made him aware that motorcycle gangs were commonly involved with guns and violence. (Tr. 20).

3

Officer Garrison decided to approach Gibson and his companion after he drove by them in his patrol car, so he turned his car around and then stopped the car about 10 to 15 feet from the men. (Tr. 23). When he stopped his car, neither the sirens or the lights were on. (Tr. 23). After he stopped his car, Officer Garrison got out of the car and identified himself as an officer with the Wolcottville Police Department. (Tr. 24). Officer Garrison asked the two men, in a normal speaking tone, to walk to the front of his car. (Tr. 24). While his companion, Randy Miller, walked to the front of the car as requested, Gibson walked past the patrol car on the passenger side and then set a two-liter bottle of Mountain Dew on the ground in the snow. (Tr. 25-26). Officer Garrison thought it was "weird" that Gibson had walked two or three feet out into the snow to set down his soda, when he could have just set it down where he was. (Tr. 27). Gibson then came back to the front of Officer Garrison's patrol car. (Tr. 26).

Officer Garrison kept asking Gibson to keep his hands out of his pockets as a safety precaution, but Gibson continued putting his hands in his pockets. (Tr. 26). Gibson was being "somewhat cooperative," but he "would not follow instructions as far as standing in front of [Officer Garrison's] car," and instead "kept wanting to walk to the side of [the] car," which made Officer Garrison nervous. (Tr. 30). Officer Garrison was also concerned because Gibson's thick jacket could easily conceal a weapon. (Tr. 20). Officer Garrison asked Gibson if he could pat him down, and Gibson said that was fine. (Tr. 26). Officer Garrison began patting down Gibson, and then Gibson made a movement and went down to his right knee. (Tr. 26). While Gibson said he slipped and fell, Officer Garrison did not think it looked like a slip or fall, as Gibson just kind of went to his knee. (Tr. 26). Officer Garrison called for backup at that time, because he was dealing with the two men on his own in an area known for crime. (Tr. 26).

4

When Gibson went down on his knee, Officer Garrison laid Gibson the rest of the way down to rest on his stomach and placed him in handcuffs for safety.  (Tr. 26, 30).  After Gibson had been placed in handcuffs, an officer from Rome City arrived to assist Officer Garrison.  (Tr. 26).  Officer Garrison then finished patted down Gibson, but the pat down did not result in Officer Garrison finding any weapon or contraband on Gibson.  (Tr. 29).

The Rome City officer took Miller back to his patrol car, while Officer Garrison remained with Gibson in front of his own patrol car.  (Tr. 27).  Officer Garrison asked Gibson what he and Miller were doing and why they were in the area.  (Tr. 27).  Gibson responded that they were on their way to the house of a man named Rodney Owens, which was half a mile from where Officer Garrison had stopped the men.  (Tr. 27).  Gibson said that they had parked at the home of Tim Criswell, who Officer Garrison knew used and sold drugs.  (Tr. 28).  Officer Garrison knew that Criswell's trailer had been moved, so essentially Gibson had parked at an abandoned lot, which Officer Garrison found to be suspicious.  (Tr. 28).  Officer Garrison was also suspicious that the men would park at the abandoned lot before walking a half mile into town to visit Owens.  (Tr. 28).  Gibson also stated that Owens was Miller's friend, and Miller was taking Gibson over to Owens's house to hang out.  (Tr. 28).

Officer Garrison then went to talk to Miller, who stated that Owens was Gibson's friend and that Gibson was taking him to Owens's house to hang out.  (Tr. 28).  Officer Garrison was suspicious because the two men's stories were not lining up, and because he did not understand why the men would park in the trailer park to walk half a mile in temperatures that were well below freezing.  (Tr. 28-29).  Nevertheless, the officers permitted both men to leave because they had no reason to detain them any longer.  (Tr. 31).  Gibson and Miller began walking back to

their car.  (Tr. 31).

After Gibson and Miller had left, Officer Garrison remained at the scene for a little while to talk with the Rome City officer as well as two Noble County deputies who had shown up.  (Tr. 31).  While he was talking with the other officers, Officer Garrison was rethinking his encounter with Gibson and Miller, and he felt Gibson may have tossed something under his car, based on Gibson's behavior during the encounter and the conflicting stories given by Gibson and Miller.  (Tr. 31).  The officers looked underneath Officer Garrison's patrol car and found a methamphetamine pipe under the front end of the car, near where Gibson had been standing.  (Tr. 31).  The road was covered with snow, but the pipe did not have any snow on it.  (Tr. 31-32).  The pipe was just laying on top of the snow, in front of the tire area on the driver's side.  (Tr. 32).  The pipe was made of glass and was about six or seven inches long.  (Tr. 32-33).  The pipe's location under the front of the car was not even a foot away from where Gibson was when he went down onto his knee during his encounter with Officer Garrison.  (Tr. 33).  Officer Garrison believed that Gibson could have "easily pitched" the pipe under the car when he went down onto his knee.  (Tr. 33).  Officer Garrison stated that it was "almost impossible to keep eyes and ears on both [Gibson and Miller] at the same time," so it was possible that Gibson had tossed the pipe under the car before going down to his knee, and it was possible that Miller might have been the one to toss the pipe under the car.  (Tr. 33).

Officer Garrison then radioed Noble County that he had found a methamphetamine pipe, and he radioed for Noble County law enforcement to conduct a traffic stop of Gibson's vehicle in order to investigate the pipe they had found.  (Tr. 34).

### 2. *Deputy Hartman's Testimony*

At the hearing, Deputy Hartman testified as follows:

On the night of December 13, 2016, Deputy Hartman received a dispatch from Noble County Communications that Officer Garrison was requesting immediate backup in the area of Lovette Street and Park Street. (Tr. 61). When Deputy Hartman had arrived at the scene, both suspects had been detained by Officer Garrison, who was talking with both of them to try to figure out why the men were walking outside at that time of night. (Tr. 61). When Deputy Hartman arrived at the scene, he recognized Gibson, whom he knew was involved in the Escorts motorcycle gang, which he believed to be involved with methamphetamine and possession of firearms. (Tr. 63-64). Deputy Hartman saw that Gibson was wearing a stocking cap with an 81 logo on it, which is the symbol for the Hell's Angels motorcycle gang. (Tr. 64). Gibson's hat corroborated the information Deputy Hartman had received about Gibson being involved in the Escorts. (Tr. 65).

Later that night, after Gibson and Miller had been allowed to leave, Deputy Hartman conducted a traffic stop on Gibson's vehicle. (Tr. 65). Deputy Hartman stopped Gibson's vehicle for two reasons: the vehicle was a two-toned decommissioned police vehicle that could not be operated on Indiana roadways under Indiana Code § 5-22-22-9, and Officer Garrison requested that Gibson's vehicle be stopped. (Tr. 65-66). Deputy Hartman heard on his radio that Officer Garrison had located a methamphetamine pipe underneath his police vehicle. (Tr. 32). Officer Garrison requested further investigation of Gibson and Miller. (Tr. 32). Deputy Hartman observed Gibson's vehicle turning southbound onto State Road 9 from 1150 North in Noble County, which is just outside of the Wolcottville town limits. (Tr. 66). Five minutes or

7

less had passed at that point from the time Gibson and Miller had been allowed to leave. (Tr. 66). Deputy Hartman was sitting in his vehicle in the parking lot of the Tire Star vehicle repair shop on State Road 9 in Wolcottville, while he listened to his radio to determine whether they wanted a traffic stop to be conducted on the vehicle. (Tr. 66). When Officer Garrison requested a traffic stop of Gibson's vehicle, Deputy Hartman pulled out of the parking lot to follow the vehicle, but he was quite a ways back from the vehicle. (Tr. 66).

Deputy Hartman saw Gibson's vehicle turn onto a side road that led to Northport Road, before turning left onto Northport Road. (Tr. 66). Gibson's vehicle gained more distance on Deputy Hartman because it took him some time to catch up. (Tr. 66-67). Deputy Hartman then saw Gibson's vehicle make a right turn onto Bayview Road, heading southbound and increasing its speed. (Tr. 67). At that point, when Deputy Hartman was turning onto Bayview Road, he activated his red and blue emergency lights to conduct a traffic stop of the vehicle. (Tr. 67). After activating his lights, Gibson's vehicle continued driving southbound on Bayview before making a right turn to head westbound on Chambers Street. (Tr. 67). Deputy Hartman radioed his dispatch and the other officers that the driver of the vehicle was failing to stop. (Tr. 67). He also activated his air horn after turning onto Chambers Street. (Tr. 68). The driver stuck his hands out of the window after Deputy Hartman activated his air horn. (Tr. 68-69). The vehicle continued between a quarter-mile and a half-mile before eventually coming to a stop in the driveway of Gibson's residence on Chambers Street. (Tr. 67).

Deputy Hartman ordered Gibson to shut the vehicle off and then step out of the vehicle while showing his hands. (Tr. 73). Gibson complied with Deputy Hartman's instructions and did not try to resist. (Tr. 73). Deputy Hartman put Gibson in handcuffs out of concern for

8

officer safety, but he placed the handcuffs with Gibson's arms in front of him, rather than behind him, given that it was cold outside and Gibson was wearing a bulky coat. (Tr. 73-74). At that point, Deputy Hartman ordered the passenger, Miller, out of the car. (Tr. 74). Deputy Hartman put Miller in handcuffs as well. (Tr. 74). Because it was so cold outside and because Miller was wearing only pajama pants and a hooded sweatshirt, Deputy Hartman placed Miller in the back of his patrol car to keep him warm. (Tr. 74). Deputy Hartman placed both men in handcuffs immediately because he was the only officer there, and because the vehicle did not stop immediately for the traffic stop. (Tr. 74). Deputy Hartman was concerned that the men might have accessed weapons in the vehicle, which would not have been found by officers during the stop of the men while they were walking on Park Street. (Tr. 74).

After placing Miller in the back of his patrol car, Deputy Hartman spoke with Gibson about why Gibson had been stopped for the second time that night. (Tr. 74-75). Specifically, Deputy Hartman explained that a methamphetamine pipe had been found underneath the Wolcottville police car. (Tr. 75). Gibson denied possession of the methamphetamine pipe or any knowledge regarding the pipe. (Tr. 75). Officer Garrison arrived at the scene of the traffic stop at that point. (Tr. 75). Deputy Hartman then asked Gibson for consent to search his vehicle. (Tr. 75). Gibson gave Deputy Hartman a conflicting answer that "he did not give [Deputy Hartman] permission . . . but [Deputy Hartman] could go ahead and search the vehicle." (Tr. 75). Deputy Hartman explained to Gibson that he was being evasive with his answer, and that Deputy Hartman just wanted to know whether he could search Gibson's vehicle. (Tr. 76). Gibson responded that Deputy Hartman could search it, but there was nothing in the vehicle. (Tr. 76). At the time Deputy Hartman asked Gibson for consent to search, he alone was

9

speaking to Gibson, he did not have his gun out, and he was using a normal speaking tone of voice. (Tr. 77). Gibson did not seem intoxicated, agitated, or to be having difficulty understanding. (Tr. 77). Gibson did not revoke consent to search the vehicle at any time after giving consent. (Tr. 77).

Deputy Hartman escorted Gibson over to Officer Garrison near his patrol car, and then Deputy Hartman began a search of Gibson's vehicle with Deputy Garry Coney. (Tr. 76). Deputy Hartman and Deputy Coney were unable to locate any contraband in the vehicle, so Deputy Hartman requested that a K-9 officer be brought to the scene by his handler. (Tr. 77). A short time later, Topeka Officer Adam Fisel, who is a K-9 handler, and his K-9, "Hero," arrived at the scene. (Tr. 77). Hero conducted a free air sniff of the vehicle, and he alerted to the driver's side of the vehicle. (Tr. 77). Hero was then placed inside the vehicle, and he again alerted to the driver's side of the vehicle. (Tr. 77). The officers conducted a second search of the vehicle at that time, but no drugs, weapons, or other contraband were found in the search. (Tr. 109-10).

While the officers were conducting the second search of the vehicle, a woman came out to the driveway from inside the residence. (Tr. 78). The woman was identified as Gibson's wife, Krista Gibson. (Tr. 78). The parties do not dispute that Mrs. Gibson came out of the house approximately 40 minutes into the traffic stop. (*See* Ex. 3 at 41:16). She wanted to know what was going on, so Deputy Hartman explained the situation to her. (Tr. 78). Deputy Hartman requested consent to search the residence from Gibson's wife; she agreed and signed a consent to search form. (Tr. 78). Because they were married, Deputy Hartman also asked Gibson for consent to search the residence, but Gibson denied his consent to the search. (Tr. 78).

Deputy Hartman issued a citation to Gibson for his violation of Indiana Code § 5-22-22-9, since Gibson did not repaint the two-toned decommissioned police vehicle prior to operating it on any roadway. (Tr. 78; Ex. 2). The citation shows that it was issued at 10:39 p.m. on December 13, 2016. (Tr. 79). The time on the citation does not represent the time the citation was generated; the time and date shown on the citation can be changed, because officers have two years from the date of an infraction to issue a citation. (Tr. 94).

### 3. Application and Warrant

On December 14, 2016, Deputy Hartman completed an application for a warrant to search Gibson's residence on Chambers Street. (DE 28-1). In the application, Deputy Hartman described the events that had taken place that evening, including: Officer Garrison's stop of Gibson and Miller when they were walking on Park Street; Gibson's kneeling down and claiming he fell; the officers' subsequent discovery of the methamphetamine pipe under the police car; the fact that Gibson and Miller were known methamphetamine users; the traffic stop of the two-toned vehicle; the consent to search the vehicle obtained from Gibson; the alert by K-9 Hero on the vehicle; the fact that the search of the vehicle did not turn up any contraband; the appearance of Mrs. Gibson; and statements made by Mrs. Gibson to law enforcement. (DE 28-1 ¶¶ 1-7). Specifically, Deputy Hartman stated the following in his application for the warrant:

> 8.  During an interview with Mrs. Gibson I learned that earlier in the day Mr. Gibson left the residence. When he did so she observed a bag of a crystal like substance sticking out of the pocket of Mr. Gibson, which she believes to be crystal methamphetamine which she knows of from previously dealing with it in the residence.

> 9.  Mrs. Gibson stated that she went into the garage and was being nosey, she went on to say that he left a safe in the garage open. She said that she saw what was believed to be

11

> methamphetamine.  She continued by saying that she saw
> money in envelopes.  The meth was in 2 separate baggies
> one was the size of a baseball and the other is the size of a
> golf ball.  She went on to say that she believes this activity
> to be dealing methamphetamine because [Gibson] has had
> people over before that are known meth users.

(DE 28-1).  Based on Deputy Hartman's application, Judge Robert Kirsch of the Noble Superior

Court issued a search warrant for Gibson's residence on Chambers Street.  (DE 28-2).

## B.  September 14, 2017, Supplemental Evidentiary Hearing

The Court held a supplemental evidentiary hearing on September 14, 2017 (DE 40), at

which Task Force Officer Sean Lundy ("Officer Lundy") and Special Agent Michael Foldesi

("Agent Foldesi") testified.  (DE 43, Transcript of Continued Motion to Suppress Hearing

("Supp. Tr.") 2).  At this hearing, the Government presented evidence that in the approximately

seven weeks leading up to December 13, 2016, Mrs. Gibson had been providing evidence to law

enforcement regarding Gibson's drug-related activities.  Gibson called no witnesses and I FIND

the testimony of Officer Lundy and Agent Foldesi to be credible.

### 1.  Officer Lundy's Testimony

Officer Lundy testified as follows:

Officer Lundy has worked with the Noble County Sheriff's Department for

approximately 15 years and has been a task force officer with the United States Drug

Enforcement Administration ("DEA") for just under four years.  (Supp. Tr. 4).  Throughout his

time with the Noble County Sheriff's Department and the DEA, Officer Lundy has worked in

corrections, patrol, and as an undercover officer.  (Supp. Tr. 5).  As an undercover officer with

the DEA's Image Drug Task Force, he has made "hand-to-hand" drug deals, investigated drug

activity in northeast Indiana, and worked with informants.  (Supp. Tr. 5-6).

Prior to December 13, 2016, Deputy Hartman contacted Officer Lundy regarding Gibson's potential involvement in dealing drugs in Rome City and Noble county, and reported that Ms. Gibson was willing to provide information on Gibson's drug-related activities. (Supp. Tr. 8-9). Other sources, independent of Mrs. Gibson, also indicated that Gibson was a source of supply and a distributor of narcotics in northeast Indiana. (Supp. Tr. 8).

The DEA interviewed Mrs. Gibson on October 31, 2016. (Supp. Tr. 9). Present at the interview were Mrs. Gibson, Officer Lundy, and Special Agent Howard Schneider ("Agent Schneider"). (Supp. Tr. 10). Mrs. Gibson was concerned about her husband's drug activity, stated that she knew him to be dealing in crystal methamphetamine, and that she knew his contacts. (Supp. Tr. 10).

Following the interview, Mrs. Gibson contacted the DEA with information on Gibson's drug-related activities about once week for approximately seven weeks. (Supp. Tr. 11-12). Mrs. Gibson sent the DEA pictures via text messages depicting Gibson's involvement in drug trafficking, including currency in Gibson's house and large amounts of crystal methamphetamine. (Supp. Tr. 12). These text messages were sometimes saved as screen shots from Gibson's phone, and would contain his phone number at the top of the picture, allowing law enforcement to identify the image as originating from his phone. (Supp. Tr. 24). However, those pictures, which were saved on a DEA phone, were deleted and cannot be recovered. (Supp. Tr. 13). Further, Officer Lundy did not believe these pictures to be sufficient to obtain a search warrant for Gibson's residence. (Supp. Tr. 25).

On December 13, 2016, prior to the traffic stop, Officer Lundy and Agent Foldesi interviewed Mrs. Gibson again. (Supp. Tr. 12). Mrs. Gibson was concerned because Gibson

13

had large amounts of crystal methamphetamine at their house, and she provided pictures of items she found in the trash and of cash in a safe. (Supp. Tr. 14-15, 26-27). Officer Lundy later confirmed while executing the search warrant that these pictures were of items in Gibson's house. (Supp. Tr. 27). Later that day, but still before the traffic stop, Mrs. Gibson informed Officer Lundy that Gibson had left the house with a large ball of crystal methamphetamine in his jacket. (Supp. Tr. 14-15, 26-27).

On the night of December 13, 2016, Deputy Hartman informed Officer Lundy that he stopped Gibson for a traffic violation, and Deputy Hartman asked how Officer Lundy wished to proceed, given his investigation into Gibson's drug-related activities. (Supp. Tr. 20-21, 29-30). Officer Lundy had planned on gathering more information before arresting Gibson or searching his house; however, in light of Gibson's traffic stop, Officer Lundy advised Deputy Hartman that the DEA was going to be applying for a search warrant for Gibson's house. (Supp. Tr. 15). Officer Lundy then shared with Deputy Hartman "what actual[] information [the DEA] had and what was inside [Gibson's] house at that time." (Supp. Tr. 21). Officer Lundy also told Deputy Hartman to "hold onto" Gibson for a while, to treat this as a normal traffic stop, and to "go ahead" and have a K-9 unit in route. (Supp. Tr. 21, 30). After talking to Deputy Hartman, Officer Lundy contacted other law enforcement in an attempt to obtain a search warrant for Gibson's house. (Supp. Tr. 21, 29-30). Ultimately, Deputy Hartman applied for the search warrant. (Supp. Tr. 22, 30).

Mrs. Gibson called Officer Lundy from inside the house about 10 minutes into the traffic stop. (Supp. Tr. 18). Mrs. Gibson, assuming that the police officers who had detained Gibson in her driveway were acting on the information she had given to the DEA, was upset because

Officer Lundy had not told her that the police officers were going to arrest Gibson that way or that night. (Supp. Tr. 17-18). Mrs. Gibson was also fearful that Gibson would harm her or her children if he found out that she had cooperated with the DEA. (Supp. Tr. 16-17). Officer Lundy explained to her that Gibson's traffic stop was prompted by other events. (Supp. Tr. 18). At that point, Mrs. Gibson wanted to consent to a search of the house, but she was hesitant because she was worried that Gibson would find out about her cooperation with the DEA. (Supp. Tr. 17).

At some point during the traffic stop, after Officer Lundy spoke to Mrs. Gibson on the phone, he arrived at Gibson's house. (Supp. Tr. 20). Officer Lundy advised Mrs. Gibson that law enforcement were going to apply for a search warrant that night, and that it would likely include information that she had given to the DEA. (Supp. Tr. 19). Mrs. Gibson told Officer Lundy that she was concerned about what would happen to her if the police officers left that night and that she wanted all the drug activity at her home to stop. (Supp. Tr. 19).

Mrs. Gibson repeated to Officer Lundy and Deputy Hartman the drug activity that she had seen earlier that day in her house, and Officer Lundy asked to her to provide a written statement to that effect. (Supp. Tr. 32). Mrs. Gibson then consented to the officers searching the house and gave a statement to Deputy Hartman. (Supp. Tr. 18-19, 31).

### 2. Agent Foldesi's Testimony

Agent Foldesi testified as follows:

Agent Foldesi has been employed by the DEA for over 26 years and is currently a special agent. (Supp. Tr. 39). Prior to working for the DEA, Agent Foldesi was with the United States Marshals Service for approximately two years. (Supp. Tr. 40-41). In his career, Agent Foldesi

has worked on organized crime drug trafficking cases, marijuana cases, methamphetamine cases, cocaine and crack cocaine cases, and cases involving other narcotics. (Supp. Tr. 40). He received 12 weeks of training in Quantico, Virginia, on working with informants. (Supp. Tr. 40).

Agent Foldesi was the co-case agent with Officer Lundy investigating Gibson. (Supp. Tr. 40). Agent Foldesi met Mrs. Gibson sometime in November 2016, after Officer Lundy and Schneider had already interviewed her. (Supp. Tr. 41). Subsequently, Agent Foldesi met with Mrs. Gibson and other law enforcement face-to-face and spoke with her on the phone approximately six times prior to December 13, 2016. (Supp. Tr. 43-45). No records of these conversations or meetings were kept in accordance with Mrs. Gibson's wishes. (Supp. Tr. 46). Agent Foldesi also observed the text messages that Mrs. Gibson had sent the DEA. (Supp. Tr. 41). In the pictures, Agent Foldesi saw narcotics, primarily crystal methamphetamine, and money in two different safes. (Supp. Tr. 41). Agent Foldesi believed that these were recent or "fresh" pictures based what Mrs. Gibson had told him. (Supp. Tr. 43). Agent Foldesi believed that, as of December 13, 2016, he had insider knowledge that there was evidence of drugs inside Gibson's house. (Supp. Tr. 41). The DEA had a plan to obtain a search warrant for Gibson's house based on evidence that did not identify or implicate Mrs. Gibson, but that plan was discarded after Gibson was stopped by law enforcement on December 13, 2016. (Supp. Tr. 42).

Agent Foldesi was present at Gibson's house on the morning of December 14, 2016, during the traffic stop. (Supp. Tr. 46). He observed Mrs. Gibson in a police sport utility vehicle with other law enforcement, apparently giving a statement, and informed her that Gibson had not been stopped that night based on what she had told the DEA. (Supp. Tr. 47).

After Agent Foldesi and Officer Lundy found out that the DEA phone containing the

16

texts from Mrs. Gibson had been wiped clean of any information, they asked her if she still had

the photographs in her phone, but she did not.  (Supp. Tr. 48-49).  She claimed that she deleted

the pictures because she was scared.  (Supp. Tr. 49).

### III.  DISCUSSION

### A.  Applicable Law

The Fourth Amendment to the United States Constitution guarantees the "right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures."  U.S. Const. amend. IV.  The Seventh Circuit Court of Appeals has recognized

that there are "three categories for police-citizen encounters in relation to the Fourth

Amendment," *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990), but "[n]ot all

police/citizen encounters implicate fourth amendment concerns . . . ." *United States v. Edwards*,

898 F.2d 1273, 1276 (7th Cir. 1990) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  The

three categories are:  (1) an arrest, which "requires that police have probable cause to believe a

person has committed or is committing a crime"; (2) an investigatory or *Terry* stop, "which is

limited to a brief, non-intrusive detention," and which requires that police "have specific and

articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is

committing a crime"; and (3) a consensual encounter, which "involves no restraint on the

citizen's liberty," and which "is characterized by [the police] seeking the citizen's voluntary

cooperation through non-coercive questioning."  *Johnson*, 910 F.2d at 1508 (citations omitted).

An arrest is a seizure under the Fourth Amendment; an investigatory stop is a more limited

seizure; and a consensual encounter is not a seizure at all under the Fourth Amendment.  *Id.; see

also United States v. Rice*, 995 F.2d 719, 723 (7th Cir. 1993).  In a consensual encounter, "the

degree of suspicion that is required is zero." *Johnson*, 910 F.2d at 1508 (quoting *Edwards,* 898

F.2d at 1276).

It is clear that "not every police encounter implicates the Fourth Amendment.  A seizure

within the meaning of the Fourth Amendment takes place if, in view of all the circumstances

surrounding the incident, a reasonable person would not believe that he was free to leave."

*United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015) (citing *Florida v. Bostick*, 501 U.S.

429, 439 (1991)).  To determine whether a reasonable person would believe he was free to leave,

and thus whether an encounter with police is consensual or is a seizure, courts consider the

following factors:

> (1) whether the encounter occurred in a public place; (2) whether
> the suspect consented to speak with the officers; (3) whether the
> officers informed the individual that he was not under arrest and
> was free to leave; (4) whether the individuals were moved to
> another area; (5) whether there was a threatening presence of
> several officers and a display of weapons or physical force; (6)
> whether the officers deprived the defendant of documents [he]
> needed to continue on [his] way; and (7) whether the officers' tone
> of voice was such that their requests would likely be obeyed.

*Id.* at 743 (quoting *United States v. Johnson*, 680 F.3d 996, 975 n.4 (7th Cir. 2012)).  "[M]ere

police questioning does not constitute a seizure" under the Fourth Amendment; "police may

approach persons and ask questions or seek their permission to search, provided that the officers

do not imply that answers or consent or obligatory."  *United States v. Childs*, 277 F.3d 947, 950

(7th Cir. 2002) (citations omitted).

Whether an investigatory stop is supported by reasonable suspicion encompasses a

"totality of the circumstances" as they were presented to the officer at the time of the encounter.

*United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995).  "The totality of the circumstances

18

encompasses both the experience of the law enforcement agent and the behavior and characteristics of the suspect." *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (internal quotation marks and brackets omitted).

Police officers are justified in conducting a brief investigative stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In assessing the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. 21-22).

## B. Analysis

In his briefs, Gibson makes the following arguments for suppression of the evidence and dismissal of the indictment: (1) Officer Garrison lacked reasonable suspicion to stop Gibson when he was walking on Park Street; (2) Officer Garrison lacked reasonable suspicion to frisk Gibson during the stop on Park Street; (3) Officer Garrison's use of handcuffs on Gibson while he was lying face down in the snow was a de facto arrest unsupported by probable cause that a crime had been committed; (4) Deputy Hartman unreasonably stopped Gibson's vehicle without reasonable suspicion or probable cause; and (5) Deputy Hartman's traffic stop exceeded its permissible scope. (*See* DE 28; DE 42). For the reasons discussed below, I FIND Gibson's arguments unpersuasive.

19

### 1. The Encounter with Officer Garrison in Wolcottville

#### a. <u>The Initial Encounter and Frisk Were Lawful</u>

First, Gibson argues that Officer Garrison did not have reasonable suspicion to stop him when he was walking on Park Street with Miller on the night of December 13, 2016. He appears to argue that this encounter was a seizure from the moment that Officer Garrison pulled up to him. However, Gibson does not assert that a reasonable person would believe that he was seized under the circumstances of the encounter or what Officer Garrison did to restrain his liberty; rather, he merely contends that Officer Garrison lacked reasonable suspicion to perform a *Terry* stop.

Contrary to Gibson's assumption, his encounter with Officer Garrison began as consensual. Again, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Childs*, 277 F.3d at 950. However, a consensual encounter can become a seizure "any time police conduct 'communicate[s] to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement.'" *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (alterations in original) (quoting *Michigan v. Cheternut*, 486 U.S. 567, 575 (1988)). The officer need not have reasonable articulable suspicion when the encounter started, so long as it came into play before the seizure was made. *United States v. Mays*, 819 F.3d 951, 957-58 (7th Cir. 2016). "A consensual encounter, which involves no restraint on a subject's liberty and is characterized by non-coercive police questions of a citizen in a public place[,]" does not require any degree of justification or suspicion of criminal activity. *United States v. Parker*, No.

3:09-CR-148 JD, 2010 WL 2943649, at *2 (N.D. Ind. July 21, 2010) (citations and internal quotation marks omitted).

When Officer Garrison initiated the encounter, he merely called Miller and Gibson over to his squad car and began asking the two, in a normal tone, what they were doing. As the encounter progressed, Gibson became less cooperative. In particular, Officer Garrison was concerned because Gibson kept his hands in his pockets and would not stand at the front of the squad car, despite Officer Garrison's repeated requests to the contrary. Nevertheless, the encounter began as consensual. Officer Garrison gave Gibson "no reason to believe that [he] [was] required to answer" his questions. *United States v. Drayton*, 536 U.S. 194, 203 (2002). Further, Officer Garrison did not "brandish a weapon or make any intimidating movement . . . ." *Id*. Moreover, it is difficult to imagine how Gibson's freedom of movement was restrained on a public road with no obstacle inhibiting his ability to walk away. *See Bostick*, 501 U.S. at 434 (noting that "no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure"); *Florida v. Rodriguez*, 460 U.S. 1, 4 (1984) (finding no seizure in a "public area of the airport"); *United States v. Hendricks*, 319 F.3d 993, 1001 (7th Cir. 2003) ("Although Officer Swisher followed the car into the Mobile station and stopped approximately fifteen feet behind it, there was nothing in front of the car to block its exit from the gas station."). Because the encounter began as consensual, the next step is to determine if, and at what point, the encounter became a seizure.

Gibson argues that, assuming that the encounter was a *Terry* stop once Officer Garrison frisked him, Officer Garrison lacked reasonable suspicion that would justify the pat-down. However, Gibson does not dispute that he consented to the frisk, much less point to any

circumstances that would render his consent involuntary. Consent is an exception to the requirement that an officer have reasonable suspicion to frisk. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *see also Davis v. United States*, 328 U.S. 582, 593-94 (1946) (stating that it is well-settled that a person may waive his Fourth Amendment rights by consenting to a search). Consent may take the form of words, gestures or conduct. *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976). When Officer Garrison asked if he could perform the frisk, Gibson said that would be "fine." (Tr. 26). Nothing Officer Garrison said "indicated a command to consent to the search." *Drayton*, 536 U.S. at 206. Officer Garrison acted "in full accord with the law" when he asked Gibson for consent, and assigning significant weight to this exchange, I FIND that Gibson freely gave consent to the frisk. *Id.* at 207. Therefore, up to this point, Gibson had not been searched or seized under the Fourth Amendment.

During the pat-down of Gibson's exterior he either dropped to a knee or fell (it is not clear from the record), and Officer Garrison laid him down and put handcuffs on him. At that point, this encounter transformed into a *Terry* stop. No reasonable person would feel free to terminate this encounter laying prostrate in the snow with handcuffs on. *United States v. Radford*, 856 F.3d 1147, 1149 (7th Cir. 2017) ("[A] seizure hasn't taken place so long as a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." (citations and internal quotation marks omitted)); *see Bostick*, 501 U.S. at 439; *United States v. Nobles*, 69 F.3d 172, 180 (7th Cir. 1995).

Because Gibson was seized, the inquiry becomes whether, under the totality of the circumstances, Officer Garrison had reasonable suspicion supporting the seizure. I FIND that he did. That neighborhood had been subject to a number of burglaries recently (Tr. 17), the weather

was extremely cold that night (Tr. 16-17), it was unusual for anyone to be walking in that area at night (Tr. 15-17), and Miller was not dressed appropriately for cold weather (Tr. 20, 22). Such "contextual considerations" are not conclusive by themselves, but may "give rise to reasonable suspicion."[1] *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (collecting cases); *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis." (citation omitted)); *United States v. Maclin,* 313 F. App'x 886, 889 (7th Cir. 2009) ("But [the defendant]'s presence at the apartment complex in the middle of a very cold night, just after reports of vehicle break-ins, although maybe not conclusive, was certainly relevant to the reasonable suspicion calculation." (citations omitted)); *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) ("[I]t is highly relevant to the reasonable suspicion analysis that the approaching vehicle's acceleration occurred in such close proximity to a newly discovered methamphetamine lab in an otherwise remote county park at a time when most people are asleep.").[2]

Further, law enforcement may consider the "behavior and characteristics of a suspect" for

---

[1] These circumstances were present from the moment Officer Garrison pulled up to Gibson and Miller, and may have been sufficient for Officer Garrison to have reasonable suspicion. However, because Gibson was not seized at the inception of the encounter, this issue will not be analyzed.

[2] Caution must be exercised in contemplating Gibson's presence in a high-crime area for the purposes of "reasonable suspicion" because it could raise "concerns of racial, ethnic, and socioeconomic profiling." *Caruthers*, 458 F.3d at 467. However, because the high-crime nature of the area is not disputed, and because Officer Garrison knew that Gibson was involved in distributing methamphetamine, these concerns regarding contextual factors are alleviated. *See id.* at 468 ("Fortunately, these concerns are alleviated here because [the defendant] concedes that the area around the intersection of Lewis and Lafayette streets in Nashville is a 'high crime' area where officers expect nightly calls regarding robberies or shots fired.").

the purpose of determining reasonable suspicion. *United States v. Mays*, 819 F.3d 951, 955 (7th Cir. 2016) (citing *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006)); *see United States v. Lenior*, 318 F.3d 725, 729 (7th Cir. 2003) ("When determining whether reasonable suspicion exists, we examine the totality of the circumstances known to the police at the time of the stop, including the experience of the officers and the behavior and characteristics of the suspect." (citation omitted)). Here, Officer Garrison properly developed reasonable suspicion from Gibson's characteristics. He recognized Gibson and knew from information provided by other officers and his experience that Gibson was involved in a violent motorcycle gang and distributing methamphetamine.

Finally, it is well established that law enforcement may develop reasonable suspicion based on evasive or uncooperative behavior. *Maclin*, 313 F. App'x at 889 (quoting *Caruthers*, 458 F.3d at 466); *see Wardlow,* 528 U.S. at 124-25 (finding that evasion is suggestive of wrongdoing). Here, Gibson ignored Officer Garrison's instructions to keep his hands in his pockets, which prompted concerns for Officer Garrison's safety, given that Gibson's jacket could contain a weapon. Nor did Gibson follow directions to stay in front of Officer Garrison's car. Gibson also was somewhat erratic in placing his Mountain Dew bottle in the snow beside the squad car. Finally, Gibson dropped to his knee during the frisk, which seemed odd to Officer Garrison. Considering all of these circumstances, Officer Garrison had reasonable suspicion to conduct an investigatory stop. *Maclin*, 313 F. App'x at 888 (citations omitted).

Gibson's arguments to the contrary are unavailing.[3] Gibson insists that walking on the

---

[3] Gibson also argues that under *United States v. Tyler*, 512 F.3d 405 (7th Cir. 2008), Officer Garrison was not permitted to stop or search him. However, *Tyler* is not an analogous case because the holding in *Tyler* prohibits law enforcement from performing a *Terry* stop when reasonable suspicion is based entirely on a mistake of law. *Id.* at 407. Gibson does not argue that any law enforcement officer took action against him based on a mistake of law,

street, as he and Miller were doing, constitutes innocent conduct that could not give rise to reasonable suspicion. However, "behavior that is innocent in isolation may in a particular context give rise to a reasonable suspicion." *Maclin*, 313 F. App'x at 889 (citing *Lawshea*, 461 F.3d at 859); *see also United States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007). Therefore, I CONCLUDE that Officer Garrison did not violate Gibson's Fourth Amendment rights by talking to him or performing an investigatory stop.

### b. Officer Garrison Lawfully Detained Gibson

Gibson's next argument is that Officer Garrison's use of handcuffs while he was face down in the snow was a *de facto* arrest that was unsupported by probable cause.

"The fault line between an investigative detention and an arrest is flexible and highly fact-intensive: 'Given the endless variations in the facts and circumstances, there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest.'" *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004) (quoting *Tilmon*, 19 F.3d at 1224). "[T]he crux of [the] inquiry is whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (citing *United States v. James*, 40 F.3d 850, 875 (7th Cir. 1994)). As a result, the scope of a *Terry* stop encompasses "the use of handcuffs and temporary detentions in squad cars." *Stewart*, 388 F.3d at 1084 (citation omitted). The key factor in evaluating Officer Garrison's use of handcuffs is whether he reasonably believed that Gibson was potentially dangerous. *See, e.g.*, *id.*; *Vega*, 72 F.3d at 515; *Tilmon*, 19 F.3d at 1226.

---

and therefore, *Tyler* does not apply to this case.

Under the circumstances, I FIND that it was reasonable for Officer Garrison to restrain Gibson and Miller with handcuffs. Officer Garrison, based on his experience, knew that Gibson was a member of a motorcycle gang, and that motorcycle gangs are commonly associated with violence, drugs and guns. Further, it was nighttime and he was alone in the presence of two men who were acting suspiciously in a high-crime area. In particular, Gibson was not cooperating with some of Officer Garrison's instructions. Moreover, Gibson has not pointed to evidence indicating that he was in handcuffs longer than was necessary to answer the officer's questions. *See Stewart*, 388 F.3d at 1085 ("Under these circumstances, it was not unreasonable for the officers to handcuff and detain Stewart in the squad car for ten minutes pending the arrival of detectives . . . ."). Therefore, I CONCLUDE that Officer Garrison's use of handcuffs did not transform Gibson's "temporary detention into an arrest." *Id*.

### c. The Meth Pipe Was in Plain View of Officer Garrison

Even if Gibson is correct, and Officer Garrison violated his Fourth Amendment rights during the encounter in Wolcottville, he has not shown grounds for suppressing evidence—that is, the meth pipe—discovered at the scene of the encounter. According to the "plain-view" exception to the Fourth Amendment's warrant requirement, "[a] warrantless seizure of an object is justified if: '(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was immediately apparent.'" *United States v. Schmidt*, 700 F.3d 934, 938-39 (7th Cir. 2012) (quoting *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004)).

Here, Gibson does not dispute that Officer Garrison was lawfully on Park Street, where he found the meth pipe. Neither does Gibson dispute that the meth pipe was in plain view.

Finally, Gibson does not contend that the meth pipe appeared to be used for something other than smoking methamphetamine. Therefore, because the plain-view exception applies, Gibson cannot argue that the meth pipe was the result of an unlawful search or seizure. *See United States v. Willis*, 37 F.3d 313, 316 (7th Cir. 1994) ("It would not have mattered, however, even if Berry's initial stop of Willis was somehow unjustified, because Berry did not need to rely on the investigative stop to attain the position from which he plainly viewed the gun."). Thus, the investigatory stop notwithstanding, I CONCLUDE that Gibson has not presented any grounds for suppressing the meth pipe as evidence.

### 2. *The Traffic Stop*

Moving on to the traffic stop, Gibson argues that Deputy Hartman lacked either reasonable suspicion or probable cause to stop his vehicle.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996) (citations omitted). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000); *see also United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012). The probable cause standard is an objective one, not a subjective one, and any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813); *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003). "The officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry." *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (citing

*United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007); *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998)).

Furthermore, probable cause is not necessary for police to conduct a traffic stop for further investigation under *Terry*, 392 U.S. 1. "To make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity is afoot." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (citing *Terry*, 392 U.S. at 30; *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000)). Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Id.* at 745 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Under Indiana Code § 5-22-22-9, a person commits a Class C infraction if that person operates a car with "a color scheme that [] duplicate[s] the color scheme of an Indiana law enforcement vehicle." Here, Gibson does not dispute that he was operating a two-toned decommissioned police vehicle which had not been repainted, or that he was known to drive such a vehicle. (Tr. 65, 70). Gibson merely argues that Deputy Hartman could not have seen Gibson's car before beginning to pursue it because he was too far away. However, Deputy Hartman testified that he was "quite a distance" away from Gibson's vehicle, not that he could not see it. (Tr. 96). Moreover, Deputy Hartman was aware that Gibson's car violated § 5-22-22-9 because other law enforcement had informed him that Gibson was driving a two-toned decommissioned police vehicle. (Tr. 65). Thus, Gibson's argument that Deputy Hartman lacked reasonable suspicion because he did not see Gibson's car lacks merit.

Furthermore, Deputy Hartman had additional cause to stop Gibson: Officer Garrison

found the meth pipe around his car and relayed this information to Deputy Hartman.[4]  Indeed, the

meth pipe did not have snow it, indicating that it had only recently been left on the road.

Considering that the officers knew that Gibson was involved in dealing methamphetamine and

that Gibson was recently in the area the meth pipe was found, it was reasonable for the officers

to infer that Gibson used the pipe and was engaged in illegal activity.  *See Mays*, 819 F.3d at 955

("When determining whether an officer had reasonable suspicion, courts examine the totality of

the circumstances known to the officer at the time of the stop, including . . . the behavior and

characteristics of the suspect." (citing *Lawshea*, 461 F.3d at 859)); *United States v. Ruiz*, 785

F.3d 1134, 1141 (7th Cir. 2015) (finding that law enforcement may develop reasonable suspicion

based on "'specific and articulable facts which, taken together with rational inferences from

those facts,' suggest criminal activity" (quoting *Terry*, 392 U.S. at 21-22)).  Therefore, the

circumstances surrounding the meth pipe conferred reasonable suspicion for Deputy Hartman to

stop Gibson.

Therefore, I CONCLUDE that Deputy Hartman had at least reasonable suspicion to

believe that Gibson had committed a traffic violation, and consequently, that Deputy Hartman

lawfully stopped Gibson.  *Whren*, 517 U.S. at 810.[5]

---

[4] Due to the collective knowledge doctrine, which will be discussed *infra*, Deputy Hartman was permitted to stop Gibson upon hearing on his radio from dispatch that Officer Garrison requested that Noble County police officers stop Gibson and investigate the meth pipe.  *See United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010) (citation omitted).  Gibson argues that the collective knowledge doctrine does not apply here because "all of [Deputy Hartman's] information came from dispatch," not directly from Officer Garrison.  (DE 28 at 22).  This argument is not persuasive, as Deputy Hartman was permitted to rely on "unverified information furnished to [him] by fellow law enforcement."  *See United States v. Lyons*, 687 F.3d 754, 768 (6th Cir. 2012).

[5] Deputy Hartman had some knowledge of the DEA's investigation of Gibson, which could serve as an additional basis for the traffic stop.  However, it appears that Deputy Hartman did not rely on evidence of the DEA's investigation when stopping Gibson.  Therefore, this evidence will not be considered in the analysis of the traffic stop.

### 3.  Mrs. Gibson's Statement

The supplemental evidentiary hearing focused on the admissibility of evidence obtained after the traffic stop, particularly the statement Mrs. Gibson gave to Deputy Hartman.  Gibson argues law enforcement impermissibly prolonged the traffic stop by approximately 40 minutes—which is excessive to complete the mission of the traffic stop—to question Gibson regarding a violation of § 5-22-22-9.  Gibson argues that this allegedly superfluous 40 minutes caused Mrs. Gibson to exit the house and give a statement to Deputy Hartman, which was used to support the search warrant for Gibson's house.[6]  Gibson argues therefore, that Mrs. Gibson's statement was the result his unlawful detainment and that her statement should be suppressed.

The Government responds that Mrs. Gibson's statement to law enforcement immediately following the traffic stop is admissible for two reasons:  (1) an ongoing investigation into Gibson, including Mrs. Gibson's cooperation, justified the length and scope of the traffic stop; and (2) even if the detention of Gibson exceeded the scope of the traffic stop, the exclusionary rule does not apply to this case because the taint of the alleged unlawful stop was sufficiently attenuated from Mrs. Gibson's statement.[7]

---

[6] Gibson challenges the evidence leading to the search warrant, but not the search warrant itself.  (*See* DE 20; Tr. 105-06).

[7] Gibson argues that the Government has played a "shell game" by changing its justifications for the traffic stop between the initial hearing and the supplemental hearing.  (DE 42 at 5).  According to Gibson, Deputy Hartman's testimony is inconsistent with that of Officer Lundy and Agent Foldesi because Deputy Hartman did not mention the DEA's investigation or Officer Lundy when describing the traffic stop or why he called for a K-9 unit.  However, Deputy Hartman's testimony that he called for a K-9 unit because Gibson was "slow to stop," and "might be hiding something in the vehicle" (Tr. 77), is not inconsistent with Officer Lundy's testimony that he told Deputy Hartman to "go ahead and have a K-9 in route and [to continue] treat[ing] his traffic stop like a traffic stop . . . ." (Supp. Tr. 30); *see United States v. Moore*, No. 1-07-CR-19-TS, 2008 WL 348770, at *7 (N.D. Ind. Feb. 7, 2008) ("The testimony of the detectives was credible and consistent with one another's.").  In fact, Deputy Hartman testified that he had received tips from other law enforcement regarding Gibson in the weeks preceding the traffic stop.  (Tr. 85-86).  Therefore, Gibson's argument that Deputy Hartman's reasons for stopping Gibson are inconsistent with Agent Foldesi's and Officer Lundy's testimony is unavailing.

a.  The Duration of the Traffic Stop Was Permissible

The Government argues that law enforcement had credible information that the house contained evidence of narcotics because of the DEA's investigation and the pipe found around Officer Garrison's vehicle.  Therefore, the Government argues, the duration of the traffic stop was permissible as a means to prevent Gibson from entering his home and potentially destroying evidence of his wrongdoing.

It is important to keep in mind that this case involves two distinct chains of evidence. The first chain of evidence involves the DEA's investigation in which Gibson's wife was providing information.  The second chain of evidence involves Gibson's interactions with law enforcement on the night of December 13, 2016.  While these two chains of evidence are distinct, they are not entirely separate; the collective knowledge doctrine allowed Deputy Hartman to rely on both chains of evidence in conducting the traffic stop after he consulted Officer Lundy.

The collective knowledge doctrine provides that "[w]hen law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officers. . . ."  *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) (collecting cases); *see also United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992); *United States v. Celio*, 945 F.2d 180, 183-84 (7th Cir. 1991).  The Seventh Circuit recognizes that the collective knowledge doctrine applies in two scenarios:  "where police departments or agencies transmit information across jurisdictions, and where officers communicate with each other at the scene of an arrest." *United States v. Harris*, 585 F.3d 394, 400-01 (7th Cir. 2009) (citing *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005)); *see Williams*, 627 F.3d at 252-53 (citation omitted).

31

Gibson does not meaningfully respond to the Government's argument that Deputy Hartman had reasonable suspicion based on the DEA's investigation through the collective knowledge doctrine. In any event, the Seventh Circuit has applied the "collective knowledge doctrine where, as is the case here, DEA agents asked local law enforcement officers to" detain a specifically-identified person, and the local officers had little or "no knowledge of the facts underlying the DEA's probable cause." *Williams*, 627 F.3d at 253; *see United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987). Even when "[t]he officer who made the stop knew nothing about the factual basis for the DEA's suspicion, other than that the DEA was coordinating a large investigation with local agencies[,]" and the DEA made a "'skeletal' request for assistance," the officer who made the stop is deemed an extension of the DEA and can act on the DEA's suspicion. *Williams*, 627 F.3d at 253 (quoting *Rodriguez*, 831 F.2d at 165-66); *see Lyons*, 687 F.3d at 768. Therefore, both chains of evidence will be considered to determine whether Gibson's detention was unreasonably prolonged in violation of the Fourth Amendment.

"When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusion, or the like, the [Supreme] Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (collecting cases); *see United States v. Burgard*, 675 F.3d 1029, 1032 (7th Cir. 2012) ("Even a permissible warrantless seizure, such as the initial seizure here, must comply with the Fourth Amendment's reasonableness requirement."); *United States v. Stoneking*, 179 F. App'x 388, 393 (7th Cir. 2006). In particular, police officers may temporarily detain a suspect "to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time." *McArthur*, 531 U.S. at 334 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 754

32

(1984)).  In determining whether a detention is reasonable, courts consider:

> (1) whether the police had cause to believe narcotics were present at the site to be searched; (2) whether there was a risk that the suspect would impair the search; (3) whether the police made a reasonable effort "to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether the suspect was detained for an unreasonable amount of time.

*Stoneking*, 179 F. App'x at 393 (quoting *McArthur*, 531 U.S. at 331-33).  Using these factors, courts balance the privacy-related and law-enforcement concerns under the circumstances. *Spebar v. City of Hammond*, No. 2:08-CV-83 JVB, 2010 WL 2952999, at *7 (N.D. Ind. July 22, 2010) (citing *McArthur*, 531 U.S. at 330).

First, Deputy Hartman had at least reasonable suspicion to believe that there were narcotics in the house.  Again, through the collective knowledge doctrine, Deputy Hartman had the benefit of insider information that Mrs. Gibson had provided that day to Officer Lundy that the house contained evidence of methamphetamine.  *See Stoneking*, 179 F. App'x at 394 (relying on an ongoing investigation into drug activity and reports from a neighboring resident of a strange smell supported the officer's reasonable suspicion to detain the defendant).  This evidence included pictures of methamphetamine and cash, evidence of Gibson's contacts who were known to use narcotics, and Mrs. Gibson's statements regarding Gibson's drug-related activity.  The reliability of this evidence was further verified by the discovery of the meth pipe earlier that evening.  In response, Gibson merely argues that Deputy Hartman and Officer Lundy are not credible because their testimonies contradict each other's description of events.  As discussed *supra*, this argument is unpersuasive and, therefore, the first element of this analysis is satisfied.

Second, law enforcement had good cause to believe that if Gibson entered his home he

would attempt to conceal or get rid of the contraband. Gibson failed to stop when Deputy Hartman activated his emergency lights, indicating that Gibson may have "suspect[ed] an imminent search." *McArthur*, 531 U.S. at 332. Additionally, Deputy Hartman could reasonably infer that Gibson, who had likely abandoned the meth pipe earlier to avoid being discovered, would "if given the chance, get rid of the drugs fast." *Id.*; *see Hahn v. Macklin*, No. IP 99-1763-C H/K, 2002 WL 243642, at *8 (S.D. Ind. Jan. 4, 2002).

Third, law enforcement made a reasonable effort to reconcile their needs with the privacy interests of Gibson. At first glance, some facts may seem to cut against admissibility on this factor. For example, as discussed *supra*, Deputy Hartman searched Gibson's vehicle and put Gibson in handcuffs. But these facts are not determinative because law enforcement did not take these actions as part of their effort to obtain a warrant. That is, Gibson consented to the search of his car, and handcuffs were used to ensure officer safety. To the extent that the K-9 unit may have been called in an attempt to prolong Gibson's detention, this did not compromise any of Gibson's privacy interests because "a canine sniff by a well-trained narcotics-detection dog" only alerts law enforcement as to the presence of narcotics, which no person has a legitimate privacy interest to possess. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (citations omitted); *see United States v. Grogg*, 534 F.3d 807, 810-11 (7th Cir. 2008). Further, when Gibson would not consent to a search of his house, law enforcement respected his wish and merely prevented him from entering his home. "They left his home and his belongings intact—until a neutral Magistrate, finding probable cause, issued a warrant." *McArthur*, 531 U.S. at 332.

Fourth, the approximately 40 minutes before Mrs. Gibson exited the house was a reasonable amount of time to detain Gibson. *See, e.g.*, *United States v. Davis*, 430 F.3d 345, 355

(6th Cir. 2005) ("There is also no evidence in the record that the additional approximately thirty-minute delay of Davis and his vehicle while the first drug-sniffing dog was located and procured was unreasonable in light of the officers' reasonable suspicions.").  The record indicates that in the time before Mrs. Gibson exited the house, law enforcement simply maintained the status quo.  *See United States v. Scheets*, 188 F.3d 829, 838 (7th Cir. 1999). Further, Gibson "has not drawn the court's attention to any evidence that" his detention was longer than reasonably necessary to execute the search warrant.  *Hahn*, 2002 WL 243642, at *8; *see Spebar*, 2010 WL 2952999, at *8 ("Plaintiff has presented no facts demonstrating that the duration and means of detention were unreasonable.").  Therefore, I CONCLUDE that Gibson's detention was reasonable in light of the circumstances of traffic stop, *Spebar*, 2010 WL 2952999, at *8, and that Mrs. Gibson's statement is admissible.

> b. Mrs. Gibson's Statement Was Attenuated From
>    Any Possible Fourth Amendment Violation

Finally, the Government argues that even if the duration and scope of the traffic stop were unlawful, then Mrs. Gibson's statement to Deputy Hartman was sufficiently attenuated from the unlawful activity as to avoid the exclusionary rule.

"[T]he exclusionary rule is not an individual right, and applies only where it results in appreciable deterrence." *United States v. Carter*, 573 F.3d 418, 422 (7th Cir. 2009) (alteration in original) (citations and internal quotation marks omitted).  Thus, the fact that an individual's Fourth Amendment rights were violated—that is, "a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Id.* (citations and internal quotation marks omitted).  "[S]trict adherence to the Fourth Amendment exclusionary rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent

purposes." *Brown v. Illinois*, 422 U.S. 590, 609 (1975) (Powell, J., concurring). "[T]he benefits

of deterrence must outweigh the costs." *Herring v. United States*, 555 U.S. 135, 141 (2009)

(citing *United States v. Leon*, 468 U.S. 897, 909 (1984)). In some cases the connection between

the Fourth Amendment violation and "the subsequent discovery of evidence" is so attenuated

that "'the exclusionary rule no longer justifies its cost.'" *Carter*, 573 F.3d at 422 (quoting

*Brown*, 442 U.S. at 609). In considering whether to apply this exception to the exclusionary

rule, courts consider the following factors: "(1) the time elapsed between the illegality and the

acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose

and flagrancy of the official misconduct[.]"[8] *United States v. Conrad*, 673 F.3d 728, 733 (7th

Cir. 2012); *see United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999) (citation omitted).

Concerning the first factor, Gibson argues that there is no temporal attenuation in this

case because Mrs. Gibson gave her statement to law enforcement while the purported unlawful

traffic stop was ongoing. Gibson is correct on this point. However, as the Government argues,

this factor is never dispositive. (DE 48 at 18 (citing *Carter*, 573 F.3d at 425; *United States v.*

*Green*, 111 F.3d 515, 521 (7th Cir. 1997)); *see United States v. Parker*, 469 F.3d 1074, 1078-79

(7th Cir. 2006). Moreover, the timing of events must be considered in context to determine

whether "the passage of time attenuates the underlying violation here." *Conrad*, 673 F.3d at

733-34 (citing *Rawlings v. Kentucky*, 448 U.S. 98, 107-08 (1980)).

The Court turns to the second factor: "whether any intervening circumstances have

occurred that might 'sever the causal connection between [the violation] and the discovery of the

---

[8] The Government argues that Mrs. Gibson's statements should be evaluated under the five-factor analysis
used by the court in *Ienco*, 673 F.3d at 733, to determine whether to suppress a live, in-court witness's testimony.
However, as Mrs. Gibson's evidence in this case was not live testimony, this analysis does not apply.

evidence.'" *Id.* at 734 (alteration in original) (quoting *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003)). Gibson argues that this second factor weighs in favor of exclusion because the Government's actions on December 13, 2016, did not lead to additional, lawfully obtained information. (*See* DE 43 at 8 ("In *Carter*, there was a significant intervening circumstance, that being additional identifying information coming from the defendant's landlord, information that was completely separate from the initial illegal search." (citing *Carter*, 573 F.3d at 424))).

Gibson's argument is not persuasive. Mrs. Gibson's cooperation in the DEA's investigation for several weeks prior to the events of December 13, 2016, was sufficient to cut off the causal connection between her statement and the alleged unlawful activity. It is readily apparent that the traffic stop had a minimal effect on Mrs. Gibson's decision to give a statement, considering that for seven weeks, including earlier that day, she had provided evidence to the DEA that Gibson had large amounts of methamphetamine and cash in the house. In other words, the evidence underlying Mrs. Gibson's statement to Deputy Hartman had already been "separately uncovered through completely lawful means." *Carter*, 573 F.3d at 423.

Nor was Mrs. Gibson's decision to give law enforcement evidence against Gibson at the time of the traffic stop wholly caused by the alleged superfluous 40 minutes. Rather, approximately 10 minutes into the traffic stop, Mrs. Gibson called Officer Lundy from inside the house and, during that call, indicated that she wanted to consent to a search of the house. Clearly, the traffic stop would have lasted more than 10 minutes even if Officer Lundy had not advised Deputy Hartman to detain Gibson, as Gibson consented to the search of his car. Moreover, Deputy Hartman was permitted to take action in investigating the meth pipe, *see Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015), including calling the K-9 unit that

arrived approximately 30 minutes into the traffic stop.  These measures would have extended the stop beyond 10 minutes, even if Deputy Hartman was not acting at the request of the DEA. Thus, the allegedly unnecessary 40-minute duration of the traffic stop was merely one of many "but for" causes of Mrs. Gibson's decision to provide a statement to law enforcement that night. However, "'[b]ut for' causation is not enough," *Conrand*, 673 F.3d at 734, and this factor weighs in favor of admissibility.

Finally, the most important factor, "the purpose and flagrancy of the official misconduct," *see id.* at 735, weighs heavily in favor of admissibility.  "This factor considers both the conduct before and after the constitutional violation."  *Id.* (citing *Reed*, 349 F.3d at 464-65). Bad faith, coercive conduct or other efforts to "cause surprise, fright, or confusion," or actions taken to engage in a fishing expedition cut against admissibility.  *Id.* (citing *Carter*, 573 F.3d at 425-26; *Reed*, 349 F.3d at 465).

Gibson contends that the Government's behavior exhibits bad faith and flagrancy by merely reciting his allegations that the Government violated his Fourth Amendment rights on December 13, 2016.  But as discussed *supra*, police conduct that night had little effect on Mrs. Gibson's decision to provide evidence in this case.  Furthermore:

> While the legality of temporarily detaining a person at the scene of suspected drug activity to secure a search warrant may be an open question, and while the officer's belief about the scope of the warrant they obtained may well have been erroneous . . . the conduct of the police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of [evidence].

*Rawlings*, 448 U.S. at 110 (citations omitted).

In fact, nothing in the record suggests that law enforcement thought that their conduct

violated a constitutional right or that they were engaged in a fishing expedition for evidence. *See Carter*, 573 F.3d at 425 (citations omitted). Rather, Gibson's detention prior to his wife exiting the house occurred while law enforcement were trying to obtain a warrant. In other words, the police officers' actions were consistent with "constitutional standards," which undermines Gibson's bad faith and flagrancy argument. *Conrad*, at 736 (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Therefore, this factor weighs heavily in favor of admissibility.

In balancing these factors, I CONCLUDE that even if the traffic stop violated Gibson's Fourth Amendment rights, which it did not, any subsequently discovered evidence was sufficiently attenuated from the alleged unlawful conduct as to be admissible.

## IV.  CONCLUSION

For the above reasons, I CONCLUDE that Gibson's Fourth Amendment rights were not violated as to warrant suppressing the evidence in this case. I therefore RECOMMEND that Gibson's motion to dismiss the indictment and/or suppress all evidence (DE 20) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Dated this 29th day of January 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

39