# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:16-CR-86-TLS |
| | ) | |
| SHON L. GIBSON | ) | |

## OPINION AND ORDER

After events that transpired late in the evening on December 13 and into the morning of December 14, 2016, the Defendant, Shon Gibson, was arrested and charged with possessing with intent to distribute methamphetamine and with being a felon in possession of a firearm. Although the Drug Enforcement Agency (DEA) had already been investigating the Defendant for dealing methamphetamine, agents had not anticipated arresting the Defendant that evening. The Defendant's interaction with local police on December 13, as well as information the Defendant's wife had provided earlier that same day regarding contraband inside their residence, prompted law enforcement to obtain a search warrant for the residence. The Defendant seeks to prevent the Government from introducing incriminating evidence discovered during the execution of the search warrant, as well as the information that was provided as grounds for obtaining the warrant, arguing that none of it would have been obtained but for an unlawful stop that took place earlier in the evening of December 13.

## BACKGROUND

On January 17, 2017, the Defendant filed a Motion to Dismiss or, in the Alternative, to Suppress Evidence [ECF No. 20]. The Defendant requested that the Court "dismiss the indictment against him or, in the alternative, to suppress all evidence obtained as a result of the

search of Gibson's home on December 13, 2016, and any subsequent custodial interrogation." (Def.'s Mot. 1.) His first challenge was to the decision of a Wolcottville police officer to stop the Defendant and his companion as they walked near a residential area. He argued that the stop was made in the absence of reasonable suspicion supported by articulable facts that criminal activity was afoot. Although no evidence was seized during the stop, and the Defendant was allowed to leave, the officer subsequently found a glass pipe commonly used to smoke methamphetamine laying on the ground underneath the officer's squad car. Seeking to further investigate the Defendant's possible connection to the pipe, police conducted a traffic stop of the Defendant in his vehicle later that night. The Defendant complained that the stop was made after the Defendant had already pulled his vehicle onto the curtilage of his property. Therefore, when officers used a drug detection dog to search his vehicle, it was in direct violation of *Florida v. Jardines*, 133 S. Ct. 1409 (2013). The dog signaled to the presence of a controlled substance inside of the vehicle,[1] and, according to the Defendant's Motion, the police used this information and the meth pipe to obtain a search warrant for the residence.[2]

The search uncovered several pieces of incriminating evidence, including drugs, drug paraphernalia, currency, and AK-47 rifles. The Defendant was arrested. On December 16, 2016, a grand jury returned a two count indictment against him. The Defendant argues that the evidence seized at his home, and any contemporaneous and subsequent statements by anyone at

---

[1] During the evidentiary hearing it was revealed that, before the drug dog was brought to the location, officers had obtained the Defendant's consent to search his vehicle, but their search did not uncover any incriminating evidence. The Defendant did not include any arguments about this initial search in his Motion. Additionally, after the dog alerted, officers conducted a second search of the vehicle but did not find any contraband.

[2] The Defendant's Motion did not specifically reference the statements that the Defendant's wife provided to law enforcement that were included in the affidavit in support of the search warrant.

the home, were the direct result of an illegal stop, search, and arrest.

Upon referral from this Court, Magistrate Judge Susan L. Collins held an evidentiary hearing on February 28, 2017. Believing that the Defendant was challenging the legality of the initial stop and the traffic stop, including the dog sniff, the hearing testimony was limited to those events. However, the parties also acknowledged that, after the traffic stop, a search warrant had been obtained for the Defendant's residence. The Government noted that the Defendant had not challenged the search warrant affidavit, and that probable cause with regard to the affidavit was not relevant to the evidentiary hearing because there had been no showing for a *Franks* hearing. The parties agreed that the correct analysis of the affidavit was within its four corners. The search warrant affidavit was not presented as an exhibit during the hearing, but it was agreed that it could be presented as an exhibit with the post-hearing briefing.

In the Defendant's post-hearing brief [ECF No. 28], he analyzed the lawfulness of the initial stop under *Terry v. Ohio*, 392 U.S. 1 (1968), and subsequent case law. Arguing that the stop was illegal under the Fourth Amendment, the Defendant asserted that "the entirety of the evidence against [him] must be suppressed." (Def.'s Br. 10) Relying on the fruit of the poisonous tree doctrine, he maintained that the initial "illegal stop . . . provided the sole grounds for the traffic stop," and that this "provided the sole grounds to detain [the Defendant] for an extended period of time on his own property," which then "gave rise to the series of events that would culminate in [the Defendant]'s wife emerging from her own home, allegedly providing the sole basis for the resulting search warrant." (*Id.*)

The Government's Response Brief [ECF No. 35] defended the initial stop of the Defendant, which also included a pat down for weapons, as being supported by reasonable

3

suspicion. With respect to the traffic stop, the Government argued that it was supported by probable cause that the Defendant committed a traffic violation. Thus, regardless of whether it was problematic to investigate the abandoned methamphetamine pipe, the stop was justified. The Government further noted that the edge of the driveway, where the Defendant stopped his vehicle, was not within the curtilage of the home. Regarding the Defendant's argument that the scope and duration of the traffic stop exceeded permissible bounds for a routine traffic stop, and that this purported violation caused the Defendant's wife to exit the house and provide information for the search warrant, the Government noted that it was a new argument. The Government submitted that Mrs. Gibson's voluntary statements were sufficiently attenuated as to dissipate the taint of any illegality that may have existed. The Government noted that the Defendant had not addressed attentuation, but simply assumed that "but for" causation was sufficient to suppress evidence. Because the Defendant had not mentioned the scope and duration of the traffic stop, or argued that it led to the Defendant's wife providing information for the search warrant, the Government requested a supplementary hearing to present additional evidence.

The Defendant's Reply Brief [ECF No. 36] took issue with the Government's portrayal of the level of suspicion that existed before the initial stop. The Defendant continued to maintain that all evidence obtained on the night of December 13, 2016, therefore, was unlawfully obtained. He alleged that the purported traffic violation was made up after the fact, as evidence by the fact that the officer did not mention it to the Defendant as the basis for the stop. The Defendant did not agree that a supplemental hearing was necessary, and argued that the Court could determine that attenuation did not apply based on the existing record.

The Magistrate Judge acknowledged the parties' arguments regarding a supplemental hearing, and found that the Defendant's original motion did not sufficiently raise the issue of the scope and duration of the traffic stop. Neither had it adequately pointed to Mrs. Gibson's pre-search statements as problematic. Rather, the Defendant's discussion of the traffic stop had focused on the officers' warrantless use of a drug detection dog to search his vehicle while it was on the curtilage of his residential property. The Defendant had argued that the search warrant for his home was obtained on the basis of the drug dog's search. Accordingly, the Magistrate Judge conducted a second evidentiary hearing on September 14, 2017.

Two DEA task force agents testified at the hearing. The agents testified that they had been receiving information from Mrs. Gibson on a weekly basis since October 31, 2016. They also testified that Mrs. Gibson had met with them on December 13, told them about methamphetamine inside the house, and showed them pictures on her phone. When the traffic stop occurred later that same day, Mrs. Gibson called one of the agents about ten minutes into the traffic stop upset because the agents had told her they were not going to arrest the Defendant that night, or in a manner that would reveal her cooperation. The agents came to the scene to talk to Mrs. Gibson, assuring her that the traffic stop was not initiated by their investigation. The investigating agents then discarded their previous plan for how the investigation would proceed, and law enforcement relied on the same information Mrs. Gibson had provided to the agents earlier in the day to apply for a search warrant.

The Defendant submitted his Brief Following the Continued Motion to Suppress Hearing [ECF No. 42] to address the testimony of the two DEA task force agents. The Defendant questioned why, if it was the Government's position that Mrs. Gibson's statements were

5

admissible regardless of any prior illegal search or seizure, the Government had "called two witnesses at the initial hearing, and forced all parties to brief matters that it now claims are completely irrelevant." (Def.'s Br. 5.) The Defendant further alleged that the testimony from the supplemental hearing was incompatible with the testimony from the initial hearing, particularly the testimony involving the traffic stop. The Defendant asked the Court to view the Government's justification as "an acknowledgement [sic] that the various stops and arrests of [the Defendant] were illegal, followed by a desperate, evidentiarly-unsupported attempt to salvage the evidence obtained as a result." (*Id.* 6–7.)

The Government, in its Supplemental Response Brief [ECF No. 46], argued that both stops were lawful and that, even if the second stop lasted too long, the statements of the Defendant's wife were voluntarily made and were not derived from the traffic stop outside her residence. The Government countered the Defendant's argument about the initial hearing and briefs by noting that the Government still maintained that both stops were lawful throughout, and that the methamphetamine pipe is incriminating evidence that it intends to use against the Defendant. Beyond that, the Government asserted that the officers were justified in keeping the Defendant from entering his residence while they obtained a search warrant. The Government's brief also emphasized that live witness testimony was less susceptible to exclusion as fruit of the poisonous tree than other types of evidence.

In his final brief [ECF No. 47], the Defendant called the Government's reference to live witness testimony a "strawman" because Mrs. Gibson did not testify at either evidentiary hearing. He submitted that Mrs. Gibson's prior cooperation, which the Government pointed to in support of the voluntariness of her statements, is not relevant to the determination of probable

6

cause because it is not in the four corners of the search warrant affidavit.[3] Finally, the Defendant reiterated that the testimony of different witnesses regarding the traffic stop was not compatible. He argued:

> The Government essentially asks this Court to pick from one of two mutually antagonistic scenarios, both of which were advanced by the Government depending on which hearing transcript one reads. In the first, Gibson is a known drug dealer whose arrest is the natural consequence of his wife's long cooperation with law enforcement. In the other, the Government knows almost nothing about Gibson's history, and the search of his home and subsequent arrest come only after Gibson is illegally detained twice, and after he continues to be detained after two searches of his vehicle fail to uncover any contraband. Because Gibson takes the Government at its initial presentation, he asks this Court to grant his Motion to Suppress, to dismiss the indictment against him, and for all other just and proper relief in the premises.

(Def.'s Supp'l Reply 4.)

On January 29, 2018, the Magistrate Judge issued a Report and Recommendation [ECF No. 48], recommending that the Court deny the Defendant's Motion to Suppress. The Magistrate Judge concluded that the initial encounter between Officer Brandon Garrison and the Defendant on the public roadway was consensual, and only turned into a seizure when Officer Garrison handcuffed the Defendant. Further, this seizure was supported by reasonable suspicion. The Magistrate Judge concluded that even if a Fourth Amendment violation occurred, the only incriminating evidence that was found—the meth pipe under the squad car after the Defendant was permitted to go on his way—was admissible under the plain view doctrine. The Report and Recommendation then turned to the traffic stop, finding that it was supported by probable cause

---

[3] The Court takes a moment to note that the Government never claimed that Mrs. Gibson's prior cooperation was relevant to whether the affidavit supported probable cause for a search warrant, which was not an issue before the Court. Mrs. Gibson's prior cooperation is directly pertinent to whether her statements on December 13, 2016, after the traffic stop were voluntary and sufficiently attenuated from the traffic stop and the Defendant's previous encounter with officers that night.

that the Defendant had committed a traffic violation, and that officers were justified in investigating the discovery of the meth pipe. The Magistrate Judge recognized that two distinct chains of evidence existed, but found that the collective knowledge doctrine allowed officers to rely on both the events of the evening and the DEA's ongoing drug investigation to extend the duration of the traffic stop. The Magistrate Judge thus concluded that the duration and scope of the stop was reasonable, and that Mrs. Gibson's statement were also admissible. What is more, Mrs. Gibson's statements were sufficiently attenuated from any Fourth Amendment violation so that exclusion of her statements would not be warranted or appropriate.

On February 6, 2018, the Defendant filed his Objection to Magistrate's Report and Recommendation [ECF No. 49], objecting to several of the Report's conclusions. First, the Defendant objects to the Magistrate Judge's conclusion that the Defendant's initial encounter with Officer Garrison began as a consensual one. He also objects to the conclusion that reasonable suspicion supported the seizure that occurred when the Defendant was placed in handcuffs later in the stop. He disagrees with the Magistrate Judge's conclusion that the use of handcuffs was reasonable. Finally, the Defendant maintains that the plain view doctrine does not apply. Based on these objections, all of which concern the initial encounter with police on December 13, 2016, the Defendant submits that his motion to suppress should be granted because none of the other events of the evening, including the traffic stop, Mrs. Gibson's statements, and the search of his home would have occurred without the initial stop.

On February 21, 2018, the Government filed a Notice to the Court [ECF No. 50], to advise that it supported the factual findings, credibility findings, and legal analysis in the Report and Recommendation, and that it had no further response to the Defendant's Objections, but was

relying on its prior briefing [ECF Nos. 35, 46].

## ANALYSIS

Under 28 U.S.C. § 636(b)(1)(A)–(B), a magistrate judge does not have authority to issue a final order on a motion to suppress evidence in a criminal case. Instead, the magistrate judge submits proposed findings of fact and recommendations to the district court. If a party files a timely objection to the magistrate judge's report and recommendation, § 636(b)(1) provides that

> the district judge is to make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The court may accept, reject, modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge also may receive further evidence or recommit the matter to the magistrate judge with instructions.

Portions of a recommendation to which no party objects are reviewed for clear error. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

The Court finds that the record before the Magistrate Judge is sufficient to allow this Court to make a de novo determination, where necessary. *See United States v. Raddatz*, 447 U.S. 667, 673–76 (1980) (holding that de novo review does not require a de novo evidentiary hearing, even when witness credibility is at issue). Neither party has requested a hearing. The Defendant's post-hearing briefing does not challenge the Magistrate Judge's recitation of the facts, but adds to the recitation based on testimony provided during the first evidentiary hearing. The Court therefore ACCEPTS and ADOPTS the Findings of Fact contained in the Report and Recommendation, and acknowledges the Defendant's additional facts.

A.  **Attenuation**

The Defendant's challenges to the Magistrate Judge's legal conclusions are limited to those pertaining to the Defendant's initial encounter with Officer Garrison. From that, he maintains that all subsequent evidence must be suppressed. But, he neither provides his own analysis of the poisonous tree doctrine, nor makes a specific challenge to the Magistrate Judge's analysis of the exclusionary rule. Therefore, because the Court finds no clear error in the analysis, it ADOPTS the conclusion from the Report and Recommendation that the statements from Mrs. Gibson, and the evidence found inside the residence, were sufficiently attenuated from any Fourth Amendment violation surrounding the initial stop or the traffic stop. Like the witness who provided a statement in *United States v. Carter*, 573 F.3d 418, 425 (7th Cir. 2009), Mrs. Gibson voluntarily cooperated with law enforcement regarding the incriminating evidence that she observed inside her house, and that information should not be discounted, or suppressed, because of other events that occurred on December 13, 2016.[4]

B.  **Traffic Stop**

The Defendant presents no objections to the portion of the Report and Recommendation discussing the traffic stop. Finding no clear error in the Magistrate Judge's analysis, the Court ADOPTS the portion of the Report and Recommendation that analyzes the traffic stop and the

---

[4] Implicit in the Defendant's arguments and the limited scope of his objections is an acknowledgment that the record, as supplemented by the second hearing, presents a major obstacle to suppressing Mrs. Gibson's statements or the items from inside the house. In his briefing after the second evidentiary hearing, the Defendant maintained that he was relying on the events as they were presented in the initial presentation. By ignoring the evidence that his wife had already been cooperating with law enforcement, the Defendant could continue to argue in favor of suppression. In objecting to the Report and Recommendation, the Defendant overlooks the legal analysis for attenuation and simply recites the chain of events as if but-for causation were adequate grounds to suppress evidence.

conclusion that it did not violate the Defendant's Fourth Amendment rights.

**C.      Initial Stop**

The methamphetamine pipe discovered under the squad car is the only other piece of evidence that is potentially implicated by the Defendant's Motion and his subsequent objections.

The Magistrate Judge's Report concludes that the encounter between the Defendant and Officer Garrison of the Wolcottville Police Department began as a consensual one. The Defendant disagrees with this assessment. He contends that it was an investigatory stop for which Officer Garrison did not have adequate particularized suspicion that the Defendant had been, or was currently, engaged in criminal activity. The Court conducts a de novo review of this portion of the Report and Recommendation.

Stated in general terms, a seizure occurs when a person's "freedom of movement" is restrained either by "physical force" or a "show of authority." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Not all encounters between law enforcement and citizens constitute seizures. "It is well settled that police may approach an individual in a public place and seek the individual's cooperation in answering a few questions. Such an encounter is not a 'seizure' within the meaning of the Fourth Amendment." *United States v. Adamson*, 441 F.3d 513, 519–20 (7th Cir. 2006) (citing *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005)).

The key distinction between a seizure and a consensual encounter is whether a reasonable person in the Defendant's position "would feel free 'to disregard the police and go about his business.'" *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999) (first quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991); then quoting *California v. Hodari D.*, 499 U.S. 621, 628

(1991)). Determining whether an individual felt free to disregard the police is a determination that should be made on the basis of "all relevant circumstances," but the Seventh Circuit has identified several factors to consider,

> including: whether the encounter occurred in a public or private place; whether the suspect was informed that he was not under arrest and free to leave; whether the suspect consented or refused to talk to the investigating officers; whether the investigating officers removed the suspect to another area; whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance.

*Id.* at 836–37. These factors, however, are neither exhaustive nor exclusive. *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015).

The Court agrees with the Magistrate Judge's conclusion that, based on the above factors, the encounter was consensual at its inception and until Officer Garrison put handcuffs on the Defendant. Officer Garrison saw the Defendant and his companion, Randy Miller, walking on a public street near a residential area late at night. He continued past them, turned his squad car around, and then stopped ten to fifteen feet away and exited his car. He did not activate his lights or siren. The Defendant and Miller made no attempt to avoid Officer Garrison's car as he approached and stopped, or when Officer Garrison identified himself by name and department. Using a conversational tone, Officer Garrison asked the Defendant and Miller to come over to the front of his squad car. The Defendant walked past the front of the car to the passenger side to place a bottle of soda on the ground. The Defendant and Miller would not have known the basis for Officer Garrison's interest when he first stopped and called them over. Officer Garrison then explained that several burglaries had occurred in the area recently, and he inquired where the men were going and where they had come from. Although Officer Garrison asked the Defendant to keep his hands out of his pockets, the Defendant kept putting them back in his pockets

12

nonetheless.

The Defendant likens the situation to the one present in *United States v. Smith*, 794 F.3d 681 (7th Cir. 2015). The Court does not agree. In *Smith*, two officer waited for Smith, who was walking alone at night, to enter an alley, rode their bicycles into the alley, made a U-turn, and positioned their bikes five feet in front of him so that his intended path forward was obstructed. 794 F.3d at 684–85. One of the officers dismounted his bicycle and approached Smith with his hand on his gun. *Id.* at 685. The officers did not introduce themselves, ask Smith for his name, or engage in any pleasantries. *Id.* Their questions were not of a general investigative nature, but were accusatory. *Id.*

In finding that there was a seizure, the court focused on the "the location of the encounter in a dark alley, the threatening presence of multiple officers, the aggressive nature of the questioning, and the fact that Smith's freedom of movement was physically obstructed by the positioning of the officers and their bicycles." *Id.* The encounter in the alley, although technically a public place, was problematic because Smith was alone and had "limited room in which to maneuver, conditions that may contribute to the reasonable belief that simply walking away from the police is not an option." *Id.*

The facts in *Smith* are distinguishable from the events of December 13, 2016, between Officer Garrison and the Defendant and Miller. Officer Garrison did not approach the Defendant and Miller in an enclosed or restricted area, but on a wide open street. He did not approach in an aggressive manner, either based on his speed or by activating his lights or sirens. A single squad car was parked ten to fifteen feet away and did not impede either pedestrian's freedom of movement. *See United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006) (finding that the

13

defendant's car was not blocked so that he would not feel free to leave when "a single squad car was parked fifteen to twenty feet away from the front of [the defendant's] car"). In fact, the Defendant chose to walk past the front of the squad car so he could place his pop bottle on the ground on the passenger side, while Miller stayed near the front driver's side of the squad car. Officer Garrison did not engage in any other displays of force or threatening conduct, such as drawing his weapon or placing his hand on his weapon. The manner in which Officer Garrison approached the Defendant and Miller would have been no different had he been concerned that they were stranded motorists in need of assistance on a cold night. Although his subsequent line of questioning suggested that he believed their activity was potentially suspicious, he did not accuse them of any crime or ask questions in a threatening tone. *See, e.g.*, *Utah v. Strieff*, 136 S. Ct. 2056, 2063 (2016) (noting that the officer's mistake was that he demanded the defendant speak to him as opposed to approaching the defendant and simply asking questions to find out what was going on inside a suspected drug house that the defendant has just left).

The Defendant argues that Officer Garrison's instructions for the Defendant to keep his hands out of his pockets cuts against a finding that the encounter was consensual. But the Defendant ignored Officer Garrison's directives about where to keep his hands. This makes it difficult to argue that a person in the Defendant's position would believe that Officer Garrison's directive was a sufficient show of authority to restrain his freedom of movement. Although Officer Garrison did request consent to perform a pat down of the Defendant's outer clothing, the Defendant agreed, and an encounter may remain consensual even after a request to search. *United States v. Wade*, 400 F.3d 1019, 1022 (7th Cir. 2005) ("Regardless of the thought processes someone who is asked to consent to a search might go through, we look to objective

factors—whether a reasonable person would feel free to terminate the encounter.") (first citing *United States v. Hendricks*, 319 F.3d 993, 1000 (7th Cir. 2003), then citing *United States v. Pedroza*, 269 F.3d 821, 826 (7th Cir. 2001)); *see also United States v. Drayton*, 536 U.S. 194, 206 (2002) (encounter remained voluntary even after officers asked bus passengers to submit to search of luggage and persons); *United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996) (defendant consented to pat-down search and the court noted similar encounters are consensual and do not implicate the Fourth Amendment).

In arguing that the encounter was at no point consensual, the Defendant makes too much of the fact that Officer Garrison stated during the evidentiary hearing that he was conducting "an investigatory stop" and that the Defendant was being "detained." (Tr. I at 42.) Officer Garrison's testimony cannot supply the legal conclusion. Before he could gather information from the Defendant about what he was doing in the area or where he was going, Officer Garrison had to stop his own vehicle and engage with the Defendant. Importantly, Officer Garrison did not communicate to the Defendant that he was being detained. The Fourth Amendment was not implicated by the stop, no matter what Officer Garrison called it during his testimony, until "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 434.

The Defendant also asserts that the very fact that he filed the Motion to Suppress is evidence that he did not believe the encounter was consensual. (Def.'s Obj. 2.) Of course, a motion filed in response to events that unfolded later, including being indicted of serious criminal charges, is not proof of what the Defendant believed at the time of the stop. Nor is it conclusive of what a reasonable person in the Defendant's position would have believed.

15

The encounter did, however, ripen into an investigative detention after the Defendant fell, or intentionally dropped, to his knee and Officer Garrison guided him to the ground and put handcuffs on him. Such a seizure is permitted if "articulable facts" support a reasonable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 21–22. "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). "Reasonable suspicion is less than probable cause, but more than a hunch." *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008).

The Defendant disagrees with the Magistrate Judge's conclusion that Officer Garrison had reasonable suspicion supporting the seizure. The Court finds that it is not necessary to determine whether reasonable suspicion developed before Officer Garrison placed the Defendant in handcuffs, and does not rely on that portion of the Report and Recommendation.[5] If the discovery of the methamphetamine pipe was not derived from the seizure that occurred when Officer Garrison placed the Defendant in handcuffs, there is no legal basis to suppress the pipe—regardless of the lawfulness of the seizure. The Report and Recommendation properly takes this into account by applying the plain view doctrine.

Officer Garrison noticed the pipe from a location he had a right to be—on a public street. No invasion of a citizen's privacy is implicated when an officer looks under his own squad car. The Supreme Court recognized in *Payton v. New York*, 445 U.S. 573, 586–587 (1980), the well-settled rule that "objects such as weapons or contraband found in a public place may be

---

[5] Similarly, it is not necessary to determine whether the use of handcuffs was reasonable.

seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity."

The Defendant argues that plain view cannot support admission of the pipe because Officer Garrison was "only in a place to discover the meth pipe *because of the* [Fourth Amendment] *violation*." (Def.'s Obj. 10.) This argument relies on the Court first finding that Officer Garrison's interaction with the Defendant violated the Defendant's constitutional rights from the beginning of the encounter to its conclusion. The Court has already said that the encounter began as a consensual one that did not implicate the Fourth Amendment. Additionally, Officer Garrison did not discover any evidence when he conducted the patdown search of the Defendant or when he handcuffed the Defendant. It was not until later, after the Defendant had left the scene, that Officer Garrison thought to look under his car. Whether a portion of his interaction with the Defendant exceeded the bounds of the Fourth Amendment does not impact the view he had of an item under his squad car.

The plain view doctrine "serves to supplement" a prior intrusion's "justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure." *Horton v. California*, 496 U.S. 128, 135–36 (1990). Officer Garrison did not need a supplement to be outside of his squad car on a public street. In other words, Officer Garrison did not need to rely on the detention (as distinct from the consensual encounter) to attain the position from which he plainly viewed the pipe. Even if Officer Garrison did not have a right to detain the Defendant when he did, he did have a

17

right to be standing outside his squad car. He did not "arrive[] at the place from which evidence could be plainly viewed" by violating the Fourth Amendment. *Horton*, 496 U.S. at 136. Moreover, because the meth pipe was in plain view in a public place, the owner's only remaining interests in the pipe were those of possession and ownership. *Texas v. Brown*, 460 U.S. 730, 739 (1983). The Defendant has not claimed either.

If the plain view doctrine did not justify the warrantless seizure of the pipe, the Court would still not find any basis to suppress it as evidence against the Defendant. Because the pipe was not discovered during a search of the Defendant, it could only be subject to suppression if it was derivative of an illegality, i.e., "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984). "The question to be resolved when it is claimed that evidence subsequently obtained is tainted or is fruit of a prior illegality is whether the challenged evidence was come at by exploitation of the initial illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 804–05 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)) (internal quotation marks and brackets omitted). The Supreme Court has "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.'" *Id.* at 815; *see also Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006) (stating that "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence").

Attenuation can occur in a variety of ways. One example is when the causal connection is remote. *Hudson*, 547 U.S. at 593 (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)). When there exists a direct causal connection, attenuation can still occur when "the interest protected by the constitutional guarantee that has been violated would not be served by

suppression of the evidence obtained." *Id.* The constitutional guarantee against seizures that are not supported by reasonable suspicion—the right the Defendant alleges was violated before the pipe's discovery—is the "right to personal security." *Terry*, 392 U.S. at 9. Here, the discovery of the pipe underneath the squad car after the Defendant had departed the scene did not intrude upon his right to personal security. To the extent that right was violated, which the Court assumes for purposes of this analysis occurred when he was handcuffed, it did not produce any incriminating evidence. The right to personal security would not be better protected by suppression of the abandoned pipe. *See United States v. Calandra*, 414 U.S. 338, 348 (1974) (providing reminder that the exclusionary rule is not "a personal constitutional right of the party aggrieved," but a judicially created remedy designed to have "deterrent effect"). Officer Garrison did not have to intrude upon the Defendant's interest to see the pipe—he could have spotted it lying on the ground regardless of whether the stop remained lawful throughout.

Finally, as stated above, the Defendant has never claimed ownership of the pipe. If the Defendant did possess it at some time, the Court has no way of knowing at what point in the stop he abandoned it. Presumably, it had to be before the Defendant's hands were cuffed. Perhaps it was not even left by the Defendant at all. The Court has only circumstantial evidence of ownership and abandonment, which can support different inference and conclusions. Those may be argued at trial.

The Court MODIFIES the Report and Recommendation to the extent it finds that Officer Garrison had reasonable suspicion to detain the Defendant when he placed handcuffs on him. Because both plain view and the attenuation doctrine support admission of the pipe as evidence against the Defendant, it is not necessary to determine if Officer Garrison's act of placing the

Defendant in handcuffs was supported by reasonable suspicion. Likewise, it was not necessary to determine if the use of handcuffs was reasonable for an investigatory stop.

## CONCLUSION

For the reasons set forth above, the Court ADOPTS IN PART, and MODIFIES IN PART, the Report and Recommendation [ECF No. 48], and DENIES the Defendant's Motion to Dismiss or, in the Alternative, to Suppress Evidence [ECF No. 20].

SO ORDERED on March 19, 2018.

                                               s/ Theresa L. Springmann
                                              CHIEF JUDGE THERESA L. SPRINGMANN
                                              UNITED STATES DISTRICT COURT